## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **BRENDA C. ROBERTS,** | ) | |
| **Plaintiff/Judgment Creditor,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **PATRICK A. PRINTUP, JR.,** | ) | **No. 02-2333-CM** |
| **Defendant/Judgment Debtor,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **SHELTER MUTUAL INSURANCE** | ) | |
| **COMPANY,** | ) | |
| **Garnishee.** | ) | |
| _____ | ) | |

### MEMORANDUM AND ORDER

This action arises out of a one-vehicle automobile accident on April 21, 2000.  At the time, defendant Patrick A. Printup, Jr. was driving the vehicle and his mother, plaintiff Brenda C. Roberts, was a passenger.  Plaintiff sustained bodily injuries from the accident.  Shelter Mutual Insurance Company ("Shelter") insured the vehicle.  Plaintiff obtained a judgment against defendant in the amount of $1,033,891.60.  Defendant assigned his claims against Shelter to plaintiff in exchange for a covenant not to execute.  Plaintiff then filed the instant garnishment proceeding against Shelter, seeking to collect the judgment in excess of policy limits.

There are two key issues remaining in this case: (1) whether Shelter acted negligently or in bad faith when it failed to initiate settlement negotiations with plaintiff prior to April 11, 2002; and (2) whether Shelter acted negligently when it failed to accept, or even respond to, plaintiff's April 11, 2002 time-sensitive offer of settlement for policy limits within ten days.  With respect to Shelter's pre-April 11, 2002 conduct, plaintiff alleges that Shelter violated its duty to defendant by acting negligently or in bad faith by:

> (1) failing to comply with generally accepted standards of care in investigating the liability claim against [defendant], (2) failing to properly evaluate the claim, (3) failing to properly document claim activity in the claim file, (4) failing to properly train and supervise claims personnel, (5) failing to give equal consideration to the interests of its insured, and (6) failing to initiate negotiations for settlement when it was apparent that liability was reasonably clear and damages were in excess of policy limits.

*Roberts v. Printup*, 422 F.3d 1211, 1220 (10th Cir. 2005).

The court held a bench trial on this matter from October 9 through 11, 2007. The parties later submitted proposed findings of fact and conclusions of law. The court has reviewed all of the parties' filings and the additional evidence admitted but not presented in open court. The court is now prepared to issue its findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

## **Findings of Fact**

### **Purchase of Car and Insurance**

1.      In April 2000, plaintiff resided with her sixteen-year-old son, defendant, in Atchison, Kansas.

2.      Defendant purchased a 1978 Ford Fairlane automobile.

3.      On April 18, 2000, plaintiff applied for coverage with Shelter on her son's newly-acquired vehicle.

4.      Karla Hackerott,[1] a Shelter agent whose office was in Atchison, helped defendant obtain the policy.

5.      The policy provided Personal Injury Protection (PIP) - Medical Expense benefits of $4,500 and bodily injury liability limits of $25,000 per person.

---

[1]  Subsequent to the time of the events relevant to this case, Ms. Hackerott married. Her name is now Karla Kautz, but the court will refer to her as Ms. Hackerott throughout this opinion.

**The Accident**

6.      Two days after insuring the vehicle, defendant was driving plaintiff home from visiting a

relative when the brakes failed.

7.      The car hit a utility pole, a park bench, and a chain link fence owned by the City of Atchison.

8.      As a result of the accident, plaintiff sustained open compound fractures of her right tibia and

fibula.  The fractures failed to knit, and she eventually had her right ankle joint fused.

Plaintiff required home health care for approximately one year after returning home from the

hospital, and her medical bills totaled over $125,000.

9.      The court has reviewed the details of the accident at length and determines that defendant

was not at fault for the accident.  The brakes stopped working on the car, and defendant acted

reasonably and appropriately under the circumstances.[2]

**Shelter's Handling of the Property Damage and PIP Claims**

10.     When notified of the accident a few days later, Shelter logged the incident as a Code 39,

which means, "one-car accident, insured at fault."

11.     The claim was assigned to adjuster Lezlie Siebolt in the Kansas City claims office.

12.     Ms. Siebolt attempted to contact plaintiff by phone and letter, and requested and obtained an

accident report from the Atchison police department.

13.     Shelter supervisor Gary Dauer reviewed Ms. Siebolt's file on May 4, 2000, and noted "may

have BI" (bodily injury) and that PIP would apply and that medical information should be

collected.

_____

        [2]  This finding is not necessary or even pertinent to the court's rulings.  But the parties
discussed the circumstances of the accident at length, presumably in an effort to convince the court
of defendant's fault or lack of fault.  The court therefore sets forth its resolution of the issue.  In
actuality, the only potentially relevant fact is whether plaintiff initially indicated to Shelter that
defendant was at fault, which could arguably trigger a duty to investigate the accident further.

14.   On May 10, Ms. Siebolt took the recorded statement of plaintiff, where plaintiff told her that defendant did everything she thought he should do when the brakes failed.

15.   Based on plaintiff's denial that defendant was at fault, Ms. Siebolt did not further investigate the circumstances of the accident.

16.   Plaintiff now clarifies that she only made the May 10 statement to Ms. Siebolt because she was concerned that defendant would get in trouble, but plaintiff's motivation in making the statement is irrelevant; there is no evidence before the court that Ms. Siebolt knew plaintiff's motivation for denying that her son was at fault.

17.   Shelter paid the city's property damage claim of $250 in May, and closed the property damage file on June 22, 2000.  Although Shelter paid the city's property damage claim, the court does not find this to constitute a determination by Shelter that its insured was at fault. Ms. Siebolt testified credibly and logically that Shelter paid the city as a business decision because sometimes the company elected to pay nominal claims rather than fight them.

18.   On June 23, plaintiff signed a PIP application.  Shortly after receiving plaintiff's medical records, Shelter paid the first medical bills submitted, exhausting the PIP medical benefits. Shelter closed the PIP claim on September 15, 2000.

## The Alleged Pre-April 11, 2002 Attempt to Make a Claim

19.   Plaintiff claims that she telephoned Ms. Hackerott in late 2000 or early 2001 to inquire about making a liability claim arising out of the April 2000 accident.  Plaintiff further claims that in response, Ms. Hackerott told her that she was not entitled to a liability claim.

20.   The court observed Ms. Hackerott testify at trial and listened to others testify about her qualifications and work habits.  She testified about her training, and specifically testified that agents were instructed not to deny claims.  The court believes that she kept good notes, even

though she had not documented several minor things.  Based on these observations, the court

finds Ms. Hackerott credible, but not perfect.  The court finds that Ms. Hackerott understood

what was important, and that she would have recognized if plaintiff had tried to make a

liability claim or ask about making a liability claim in late 2000 or early 2001 and would

have reacted in a manner consistent with her training.  The court further finds that Ms.

Hackerott would have documented the phone call had plaintiff asked her if she could make a

liability claim in late 2000 or early 2001.

21.      In light of all of these observations, the court finds that plaintiff called Ms. Hackerott in late

2000 or early 2001, but that they only had a general conversation—not the specific

conversation that needed to take place in order for Shelter to be on notice that plaintiff

wanted to make a claim.  The conversation may have been the one documented by Ms.

Hackerott on April 21, 2001, where Ms. Hackerott's notes indicate that plaintiff inquired

about changes in insurance coverage.

22.      The court further finds that Ms. Hackerott did not tell plaintiff that she had no claim or was

not entitled to a liability claim.

23.      In making these factual findings, the court necessarily finds the testimony of plaintiff on this

subject not credible.  Although Dee Sunderman also testified that plaintiff asked about

making a liability claim, she was not present during the alleged phone conversation.  She

stated that she heard plaintiff ask about a "claim" before leaving the room, but when cross-

examined about what she heard, she was unable to verify plaintiff's allegations with

certainty.  The court finds it credible that Ms. Sunderman looked up a phone number for

plaintiff to call Ms. Hackerott.  The court also finds it credible that Ms. Sunderman and

plaintiff discussed plaintiff's medical bills and Ms. Sunderman's own automobile accident

before plaintiff called Ms. Hackerott.  But the court does not find Ms. Sunderman's

recollection of what she heard plaintiff say on the phone to be reliable corroboration of

plaintiff's allegation that she inquired about making a liability claim.  Ms. Sunderman only

heard a portion of the conversation, and admitted on cross-examination that she really only

remembered hearing the word "claim."  (Transcript, at 102 line 11).  Moreover, Ms.

Sunderman testified that at the end of the conversation, Ms. Hackerott told plaintiff that she

would get back to her.  (Transcript, at 93, lines 14–16).  Ms. Sunderman recalled that a few

days later, Ms. Hackerott informed plaintiff that she could not file a claim.  (Transcript, at

93, lines 17–22).  Plaintiff, on the other hand, testified that when she called Shelter, Ms.

Hackerott told her that she was not entitled to make a claim.  (Transcript, at 20, line 22 to 21,

line 6).  The inconsistencies in the recollections also cause the court to question the

reliability of Ms. Sunderman's testimony.

24.     Plaintiff's credibility on this issue was weakened by two factors: In plaintiff's deposition, she

testified that she made an explicit decision not to pursue a claim prior to April 11, 2002

because she was still being treated until February 2002.  In addition, the court finds it

significant that plaintiff did not recall any other contact with Ms. Hackerott, yet Ms.

Hackerott's file reflects numerous other contacts with her.  The court questions why

plaintiff's memory appears to be strong with respect to one particular conversation, but not

others.  Noticeably, throughout plaintiff's testimony, she appeared to exhibit selective

recollection.  The court observed plaintiff on the witness stand.  Her mannerisms and tone

suggested that she remembered what was beneficial to her case, but either forgot or chose not

to remember the answers to many of defense counsel's questions.  The court's impression of

plaintiff was that she elected not to search her memory to answer questions for defense

counsel.  This weakened her overall credibility.

### The April 11, 2002 Letter

25.     On April 11, 2002, plaintiff submitted an apparent *pro se* demand for policy limits to satisfy all claims against her son arising from the motor vehicle accident.  She consulted with counsel before sending the letter and had counsel review it before mailing it.  In fact, she was in counsel's office when she called Shelter to see where to send the letter.  At the time of the call, plaintiff chose not to present her claim on the phone, but instead mailed it to Topeka.

26.     The court is uncertain why plaintiff did not present her claim on the phone.  The court finds plaintiff's motivation somewhat suspect.  Nevertheless, the court finds that plaintiff did not intentionally send her claim to the wrong office or artificially and unnecessarily shorten Shelter's available response time in order to set up or manufacture a bad faith claim.

27.     In the April 11 letter, plaintiff offered to settle all claims for the $25,000 policy limits.  It further stated, "I am running out of time and need your answer within ten days."

28.     Plaintiff needed the answer within ten days because the two-year statute of limitations on her claim expired on April 22, 2002.

29.     Plaintiff and her attorney had an agreement that if Shelter paid its policy limits of $25,000 before the statute of limitations expired, plaintiff would not owe attorney fees on her recovery.

30.     To protect her claim against the statute of limitations, plaintiff authorized her attorney to file a petition in the District Court of Atchison County against her son at her cost, with directions to hold service of process.

31.     Plaintiff instructed her attorney to dismiss the lawsuit if Shelter accepted her offer before the statute of limitations expired, but to serve defendant if Shelter did not accept her offer.  She

filed the lawsuit on April 16, 2002, and requested issuance of a summons on April 24.

32.    Plaintiff never intended to pursue a claim in excess of policy limits against her son.

Plaintiff's opinion about her son's behavior before and during the accident never changed;

shortly after the accident, she told Ms. Siebolt that he was not at fault.  During her

deposition, she admitted that she had little to no basis for a claim of fault against her son.

And during trial, she said that her son did everything he could possibly do to bring the car to

a stop.

33.    The only activity that plaintiff's counsel did beyond filing the suit was mailing summons to

defendant.  But once process was issued, plaintiff became obligated to pay attorney fees on

any money paid by Shelter.

34.    On April 15, 2002, Shelter's Topeka Claims office stamped plaintiff's April 11 letter

"received."

35.    Six days later, Shelter placed the April 11 letter in a daily mail packet by regular first class

mail to the PIP department in Columbia, Missouri.

36.    Ten days after receiving it, the PIP department mailed the April 11 letter to Brian Stegman in

Kansas City Claims, which was the correct place for the letter to be.  Kansas City Claims

received the letter on May 6, 2002.

37.    In April 2002, Shelter did not have a written policy, procedure, or mechanism in place to

ensure that a claim would be acknowledged within ten working days.

38.    On May 7, 2002, Chris Wilhite, who was then supervising Ms. Siebolt, contacted Shelter's

litigation attorney Carter Ross about the claim.  They concluded that upon confirmation of

the medical bills, Shelter would pay the limits.

39.    Ms. Siebolt called plaintiff that same day to advise her of Shelter's position and request

copies of the bills.

40. On either May 9 or May 10, 2002, Shelter offered its $25,000 policy limits to plaintiff.

41. Plaintiff refused the offer.

42. Leslie Clay, a Shelter litigation attorney, estimated the value of plaintiff's claim against defendant to be between $300,000 and $500,000 if a jury found defendant liable. These estimates, if correct, could expose defendant to an excess judgment in the amount of $275,000 to $475,000 if he were 100% at fault for the accident.

## Conclusions of Law

1. With respect to plaintiff's multiple claims of negligence and bad faith regarding Shelter's pre-April 11, 2002 conduct, plaintiff is not entitled to recover. Because the court finds that plaintiff did not make a claim prior to that time, Shelter did not owe defendant a duty to initiate settlement negotiations or otherwise investigate a liability claim prior to April 11, 2002. *See Roberts*, 422 F.3d at 1216 ("[A]n insurance company does not have a duty to the insured to initiate negotiations prior to a claim being made."). Prior to April 11, a conflict did not exist between the interests of defendant and Shelter such that it imposed a duty upon Shelter to consider the interests of defendant. *See generally id.* at 1215–16.

2. The April 11, 2002 letter, however, was a time-sensitive demand letter that created a duty for Shelter to act without negligence in handling the offer.

3. With respect to plaintiff's claim that Shelter was negligent when it failed to accept, or even respond to, plaintiff's April 11 letter, the court considers the factors set forth in *Bollinger v. Nuss*, 449 P.2d 502 (1969), to the extent that they are relevant:

> (1) the strength of the injured claimant's case on the issues of liability and damages; (2) attempts by the insurer to induce the insured to contribute to a settlement; (3) failure of the insurer to properly

investigate the circumstances so as to ascertain the evidence against
the insured; (4) the insurer's rejection of advice of its own attorney or
agent; (5) failure of the insurer to inform the insured of a compromise
offer; (6) the amount of financial risk to which each party is exposed
in the event of a refusal to settle; (7) the fault of the insured in
inducing the insurer's rejection of the compromise offer by misleading
it as to the facts; and (8) any other factors tending to establish or
negate bad faith on the part of the insurer.

449 P.2d at 512 (citation and quotation marks omitted). Many of the *Bollinger* factors are

not directly applicable here because Shelter did not refuse to settle; Shelter instead missed

plaintiff's settlement deadline and attempted to accept plaintiff's offer approximately three

weeks after the offer had expired.

4.    In addition to the *Bollinger* factors, the court must also consider the impact of the Tenth

Circuit's recent opinion addressing Kansas bad faith law, *Wade v. Emcasco Ins. Co.*, 483

F.3d 657 (10th Cir. 2007). *Wade* held that the court should consider "relevant aspects of the

third-party plaintiff's conduct, including any responsibility the plaintiff might have for the

insurer's lack of adequate information upon which to judge a proposed settlement offer and

the reasons the plaintiff had for declining to entertain an offer after expiration of a deadline"

along with other pertinent *Bollinger* factors. 483 F.3d at 670.

5.    <u>The strength of the injured claimant's case on the issues of liability and damages</u>: This factor

weighs equally for both parties. Plaintiff suffered serious injuries and significant damages as

a result of the car accident—well above the $25,000 liability insurance available. On the

other hand, Shelter's initial investigation of the accident indicated that plaintiff did not

consider defendant to be at fault (regardless of whether Shelter logged it initially as a "Code

39" and paid the City of Atchison's $250 claim). The court likewise does not assess any

fault to defendant for the accident. While it is possible that a jury might have assessed some

fault to defendant, the court finds that likelihood low.  Moreover, in light of the fact that the

parties are mother and son, the court determines that the case for liability was not strong.

Nevertheless, one of Shelter's employees who handled the letter should have noted the large

amount of damages referenced in the letter and ensured that it was promptly and correctly

processed.

6.      Attempts by the insurer to induce the insured to contribute to a settlement: This factor is

inapplicable here.

7.      Failure of the insurer to properly investigate the circumstances so as to ascertain the evidence

against the insured:  Although perhaps Shelter could have investigated the accident more

thoroughly shortly after the accident, plaintiff had not made a liability claim at that time, and

in fact expressly denied that defendant was liable.  Based on plaintiff's statement to Ms.

Siebolt and the relationship between plaintiff and defendant, the court finds that Ms. Siebolt

exercised reasonable care in handling the initial investigation under the unique circumstances

of this case.[3]  At that time, Shelter did not owe a duty to defendant to conduct a more

thorough investigation.  After plaintiff made the claim through her April 11, 2002 letter,

Shelter decided to pay the full amount of the claim without further investigating liability.

---

[3] In making this determination, the court does not rely in whole or in part on the expert
testimony of Eugene Balloun or James O'Malley.  The court does not strike their testimony
(although plaintiff previously asked the court to exclude the testimony of Mr. Balloun), but finds
reliance on the testimony unnecessary in light of the other evidence presented at trial.  The court
acknowledges that plaintiff's expert, Ronald Hoover, testified that Ms. Seibolt should have more
thoroughly investigated the accident.  The court has considered Mr. Hoover's testimony, but finds it
outweighed by other evidence.  As Shelter's response brief (Doc. 164) states on page 24, "Perhaps
the expert testimony can provide some guidance on how the evidence can be viewed, but it is
certainly not the key evidence to consider in this case."  In deciding this case, the court has placed
little weight on the expert testimony presented, and accordingly does not discuss it beyond this
footnote.

This factor weighs in favor of Shelter.

8.      <u>The insurer's rejection of advice of its own attorney or agent</u>: Shelter did not reject advice of
its own attorney; to the contrary, Carter Ross advised Shelter to accept plaintiff's demand
and pay the limits, which Shelter then attempted to do.  This factor weighs in favor of
Shelter.

9.      <u>Failure of the insurer to inform the insured of a compromise offer</u>: This factor is somewhat
troubling for the court.  Shelter did not advise defendant of plaintiff's demand or Shelter's
response.  But plaintiff was also making a claim against her own son, and plaintiff was
actually the named insured on the policy.  Shelter attempted to accept the amount of the
offer, which would have resolved the claim without personal liability to defendant.
Considering the unique circumstances of this case, the court determines that Shelter's failure
to contact defendant does not weigh heavily against Shelter.

10.     <u>The amount of financial risk to which each party is exposed in the event of a refusal to settle</u>:
Again, this factor has a unique application in this case.  Under more common circumstances,
defendant might have been at risk for significant liability as a result of Shelter's failure to
process plaintiff's April 11 letter more quickly.  Here, however, plaintiff has never stated that
defendant was at fault for the accident, and she did not have any intention of executing on a
judgment against her own son.  This factor does not weigh heavily against Shelter.

11.     <u>The fault of the insured in inducing the insurer's rejection of the compromise offer by
misleading it as to the facts</u>:  This factor is inapplicable here.

12.     <u>Any other factors tending to establish or negate bad faith on the part of the insurer</u>:  The
court notes, as the Tenth Circuit did in its decision remanding this case, that in Kansas, every
insurer is to acknowledge the receipt of a claim within ten working days.  Shelter did not

comply with this standard.

13.     Upon consideration of all of these factors and the factual findings issued by the court above,
        the court determines that Shelter breached a duty to defendant when it failed to respond to
        plaintiff's April 11, 2002 letter within ten days.  As a result, plaintiff became obligated to
        pay her attorney a portion of her recovery.  Plaintiff did not present evidence on how much
        the attorney fees impacted her recovery.

14.     Plaintiff claims that it was because she had to pay her attorney that she then refused to accept
        the $25,000 to release her claims.  Because plaintiff refused to accept Shelter's $25,000 as a
        full release of her claim, she pursued her lawsuit against defendant and obtained the excess
        judgment against him.  In other words, plaintiff claims that Shelter's negligent treatment of
        her demand letter caused the failure to settle and ultimately caused defendant's damages.

15.     It is here—at the point that the court determines whether Shelter's negligence caused the
        failure to settle—that the *Wade* court's facts and decision need to be compared to the facts in
        this case.[4]  In *Wade*, the plaintiff intentionally deprived the insurer of information in order to
        hamper the insurer's ability to investigate the accident.  483 F.3d at 669, 671.  The plaintiff
        also imposed an arbitrary settlement deadline.  The Tenth Circuit held that the plaintiff's
        conduct, not the insurer's delay in accepting the plaintiff's offer, caused the failure to settle.

16.     Although the holding in *Wade* is distinguishable from the instant case in several ways, the
        rationale used in *Wade* still applies.  *Wade* emphasized "'that there must be a causal link

---

[4] In her response brief (Doc. 163), plaintiff argues that Shelter is using *Wade* as a civil entrapment defense.  Plaintiff argues that in order for Shelter to present a defense that plaintiff "manufactured" a negligence claim, Shelter must first admit that its actions were negligent.  Plaintiff cites no authority for this position, and *Wade* contains no such requirement.  The court finds plaintiff's argument unavailing.

-13-

between the insurer's conduct and the excess judgment against the insured.'"  483 F.3d at

674 (quoting *Hawkins v. Dennis*, 905 P.2d 678, 690 (Kan. 1995) (additional citation

omitted)).  As an example, *Wade* suggested that where a claimant expended time and

resources preparing for trial because an insurer delayed in settling a claim, then the causation

element could be met.  *Id.*  On the other hand, "if a claimant arbitrarily withdraws an initial

settlement offer and later rejects an identical proposal from the insurer, the claimant's

conduct is the legal cause of the failure to settle."  *Id.*

17.    This case is factually distinguishable from both examples given in *Wade*.  Plaintiff's conduct

was not arbitrary, but the court also does not find it wholly justified.  In light of the statute of

limitations on her claim, plaintiff reasonably set a ten-day deadline.  She filed suit before the

deadline passed, however, and elected to effect service three days after the deadline rather

than following up with Shelter to see why she had not received a response.  While this does

not present a clear case where plaintiff "manufactured" a lawsuit, the court finds that she

appeared to be eager to capitalize on Shelter's mistake despite the fact that Shelter quickly

tried to remedy it.  The court is unconvinced that the circumstances changed enough during

the three weeks between plaintiff's deadline and Shelter's attempted settlement to justify

plaintiff's refusal to settle.[5]  Plaintiff had not engaged in costly and time-consuming

discovery or other similar tasks involved in litigation.  Her attorney mailed a summons to her

son.  That was the only additional effort involved as a result of Shelter's delay.

---

[5]  Plaintiff suggests on page 43 of her proposed findings of fact and conclusions of law (Doc.
161) that "Shelter made no effort to negotiate above its policy limits to account for the additional
loss to [plaintiff]."  Plaintiff does not offer a citation to the record for this statement.  The court has
reviewed the record thoroughly and has not found evidence to support the statement.  Plaintiff's
statement may be true, but it would be improper for the court to consider it.

18.    Nearly immediately after the letter reached the appropriate office, Shelter offered to pay
       plaintiff the limits of the liability insurance.  The court finds that Shelter "acted as if the
       insurance contract had no policy limits," which is precisely how the cause of action for
       failure to settle is intended to require the insurer to act.  *Id.* (citing *Bollinger*, 449 P.2d at
       511).  Allowing plaintiff to recover for Shelter's mistake in this instance would promote the
       situation that *Wade* warned against: it would "permit bad faith [or negligence] in the
       insurance milieu to become a game of cat-and-mouse between claimants and insurer, letting
       claimants induce damages that they then seek to recover, whilst relegating the insured to the
       sidelines as if only a mildly curious spectator."  *Id.* at 669–70.

19.    In light of the court's findings and conclusions, the court need not address the family
       immunity issue raised by Shelter.

       **IT IS THEREFORE ORDERED** that judgment is entered for Shelter and against plaintiff.

       Dated this 10th day of July 2008, at Kansas City, Kansas.

                                             **s/ Carlos Murguia**
                                             **CARLOS MURGUIA**
                                             **United States District Judge**